**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                              :
PAUL SCAGNELLI, et al.,       :   CIVIL ACTION NO. 09-3660 (MLC)
                              :
     Plaintiffs,              :   MEMORANDUM OPINION
                              :
     v.                       :
                              :
RONALD A. SCHIAVONE,          :
                              :
     Defendant.               :
_____:
```

**COOPER, District Judge**

Plaintiffs, Paul Scagnelli, James Hamill, and Carl Cosenzo ("Plaintiffs"), brought this action against Ronald A. Schiavone, individually and as the sole Trustee of the Ronald A. Schiavone Living Trust ("Defendant"), asserting causes of action for (1) breach of an enforceable oral contract, (2) breach of the covenant of good faith and fair dealing, (3) promissory estoppel, (4) quantum meruit, (5) unjust enrichment, (6) common law fraud/misrepresentation, and (7) negligent misrepresentation. (Dkt. entry no. 14, Am. Compl.)

Defendant moves for summary judgment in his favor as to all claims. (Dkt. entry no. 37, Def. Mot. Summ. J.) Plaintiffs oppose the motion. (Dkt. entry no. 39, Pls. Opp'n Br.; dkt. entry no. 38, Moskowitz Aff. (joining, on behalf of Cosenzo, arguments made in opposition to motion by Hamill and Scagnelli).)

The Court heard oral argument on the motion on August 2, 2012. For the reasons stated herein, the Court will grant the motion.

I.   **Background**

   A.   **Plaintiffs' Employment and Sale of SCC**

   Plaintiffs, sometimes referred to by the parties as the "troika," were executives at Schiavone Construction Company ("SCC"). (Am. Compl. at ¶¶ 9-11; dkt. entry no. 37-2, Def. Stmt. Facts at ¶ 4; dkt. entry no. 39-1, Pls. Resp. Stmt. Facts at ¶¶ 3-4.) Defendant and Raymond Donovan ("Donovan"), who is not a party to this action, each owned 50% of SCC. (Def. Stmt. Facts at ¶ 2.) SCC was sold to Dragados Inversiones USA, S.L. ("Dragados"), the United States subsidiary of a Spanish construction company, in December 2007 for $150 million. (Id.)

   SCC's bonding companies had expressed concern about continuity of SCC's management in 2006, prior to SCC's sale. (Id. at ¶ 6; dkt. entry no. 37-3, Taylor Cert., Ex. D-1, 11-13-06 Letter.) It was contemplated that employment agreements between Plaintiffs and SCC might allay that concern. (Def. Stmt. Facts at ¶¶ 7-8.) Plaintiffs composed a proposed employment agreement ("First Draft") addressing future compensation and other terms of employment, and presented this proposed employment agreement to Defendant in January 2007. (Taylor Cert., Ex. D-3, Fax and Proposed Employment Agreement.) The First Draft provided, inter

2

<u>alia</u>, that in the event SCC was sold, Plaintiffs would each receive 1.666% of the sale price from SCC.  (<u>Id.</u> at at 20; Def. Stmt. Facts at ¶ 9.)

Defendant responded in April 2007 with an alternative draft ("Second Draft") employment agreement that provided lower guaranteed compensation to Plaintiffs, but in a handwritten edit, increased the amount Plaintiffs would receive in the event of SCC's sale to 2% of the value of the proceeds of the sale.  (Def. Stmt. Facts at ¶ 10; Taylor Cert., Ex. D-16, Second Draft at 21; Taylor Cert., Ex. G, Scagnelli Aff. at ¶ 12.)  Plaintiffs did not sign or execute the Second Draft.  (Def. Stmt. Facts at ¶ 11; Pls. Resp. Stmt. Facts at ¶ 11; Pls. Supp'l Stmt. Facts at ¶ 18; Scagnelli Aff. at ¶ 14.)  In the summer of 2007, Donovan announced that he and Defendant were selling their interests in SCC to Dragados.  (Def. Stmt. Facts at ¶ 12.)

Plaintiffs prepared a memo and list of "Issues for Consideration regarding Sale of Schiavone Construction to Dragados" in August 2007.  (Taylor Cert., Ex. D-10.)  That list included "Payment of 2% of Sale Value to each [Plaintiff] in accordance with terms currently included in Letter of Intent between SCC and Dragados" as an issue for the existing SCC ownership to consider.  (<u>Id.</u>)

Defendant contends that as of August 2007, no agreement existed as between Plaintiffs and Defendant with respect to Plaintiffs receiving a share of Defendant's proceeds from the sale of his stock.  (Def. Stmt. Facts at ¶ 14.)  Plaintiffs disagree, contending that "[t]here was always an agreement in principle since at least December 7, 2006[,] that the Troika would receive a share of Defendant's proceeds from the sale of his stock."  (Pl. Resp. Stmt. Facts at ¶ 14.)  However, Plaintiffs admit that they do not, nor have they ever, "had a written employment agreement with SCC."  (Scagnelli Aff. at ¶ 5; see also id. at ¶ 28 (noting that by the time the sale to Dragados took place, Plaintiffs "were still without a formal document formalizing our agreement" regarding either Plaintiffs' participation in the sale or the terms of their employment); Taylor Cert., Ex. A, Hamill Dep. at 63:8-16.)

Shortly before the sale of SCC to Dragados was effected, Plaintiffs wrote to Defendant and Donovan on December 14, 2007, noting that each of the Plaintiffs still did not have an employment agreement, but they remained "interested in pursuing the possibility of entering into employment agreements with the Company."  (Taylor Cert., Ex. D-11, 12-14-07 Letter.)  The 12-14-07 Letter references Plaintiffs' belief that they "are entitled" to compensation "for our years of service to the Company," and

4

their "understanding that compensation for [Plaintiffs'] past contributions will be paid by you, the Company's owners, and not the Company." (Id.)  Significantly, Plaintiffs wrote: "[W]e respectfully request that you provide us with your proposal on what compensation we can expect for such past efforts as soon as possible." (Id.)  The sale of SCC occurred on December 31, 2007.

Following the sale of SCC to Dragados, Hamill contacted Defendant several times in a further attempt to resolve what Plaintiffs believed to be the outstanding issue of receiving their share of the proceeds of the sale. (Def. Stmt. Facts at ¶ 17; Hamill Dep. at 66:10-67:10 (stating that in early 2008, Hamill contacted Schiavone because Plaintiffs had "not heard anything on the settlement" of the sale, and Schiavone responded "he was still thinking about it, and he was going to do something," and that in a subsequent conversation, Schiavone indicated that "he was thinking about settling" with each of the Plaintiffs individually, and wanted to meet with them "to discuss . . . the percentages").)  In July 2008, Plaintiffs sent a letter to Defendant, asking for a resolution of the "financial settlement" issue. (Taylor Cert., Ex. D-12, 7-25-08 Letter.) That letter states in pertinent part:

> In early 2007 we provided you with a Sales Participation Agreement, along with a copy of a proposed Employment Agreement.  These agreements where

> [sic] put together for two reasons:  the future sale of
> the company and the bonding companys [sic] where [sic]
> asking that employment agreements be established for
> the three of us.  We met with you on this agreement and
> you commented.  What we are asking of you at this time,
> is to look at the agreement that was given to you at
> the beginning of 2007, and your comments on this
> agreement and get back to us as soon as possible on a
> financial settlement.

(7-25-08 Letter.)  Plaintiffs noted that they had not impeded the

sale of the company and asked Defendant to get back to them.

(Id.)

Defendant responded to the July 25, 2008 letter on August

12, 2008, denying the existence of any "matter requiring

'settlement'" and further stating:  "An offer made to you some

time ago – but at the appropriate time – was completely and

clearly rejected by you, and it was an offer the owners of SCC

were under no obligation to make."  (Taylor Cert., Ex. D-13, 8-

12-08 Letter.)  At his deposition, Defendant denied ever having

promised to any of the Plaintiffs that he would give them money

from the proceeds of the sale of Defendant's shares of SCC.

(Taylor Cert., Ex. E, Schiavone Dep. at 142:2-16.)

       **B.   The Alleged Oral Agreement**

Plaintiffs take the position that they were verbally assured

2% of the sale price of SCC, in the event that it was sold,

because Defendant repeatedly assured Plaintiffs that he was going

to "do something," which Plaintiffs understood in context to mean give them a share of the sale proceeds.  (Hamill Dep. at 64:5-14 ("Q.  Did [Schiavone] say what he was going to do?  A.  No, he did not.").)  Scagnelli states that when "Defendant promised the Troika that he would 'do something,' [Plaintiffs] understood Defendant's promise to mean that he would share with [them] a percentage of the sale proceeds consistent with his continued promises and assurances.  The amount may have evolved from 1.66% to 2% at the initiation of Defendant, but there was always an understanding that Defendant would share in the sale proceeds." (Scagnelli Aff. at ¶ 30.)

The origins of this alleged agreement apparently go back to late 2006, when Plaintiffs and Defendant met at Fiddler's Elbow Country Club and "agreed that certain incentives should be included in the employment agreement with each of the plaintiffs, including . . . rights for each member of the Troika to participate in the proceeds of a sale of SCC.  It was agreed at this time that the Troika would share in the proceeds of SCC's sale in return for continuing on as executive-level management and facilitating SCC's sale."  (Scagnelli Aff. at ¶ 9.) Plaintiffs contend that while they had reservations about the "form" of the Second Draft, "the compensation provision and particularly the increased share in the sale proceeds provision

was never a basis for the Troika's objection," such that, at that point, they believed an oral agreement to share in 2% of the proceeds existed.  (Scagnelli Aff. at ¶¶ 14, 20, 23, 26.) Cosenzo identifies the meeting at which Defendant hand-wrote the 2% figure on a draft employment agreement as "the initial representation" forming the basis of the alleged oral contract Plaintiffs seek to enforce.  (Taylor Cert., Ex. C, Cosenzo Dep. at 40:17-41:10; see also dkt. entry no. 39-1, Pls. Supp'l Stmt. Facts at ¶ 31 ("The Troika believes they are entitled to two (2) percent share of the sale proceeds as a result of the April 15, 2007 meeting at Defendant's house where he presented the Second Draft with that provision handwritten in by Defendant himself. After that meeting, Defendant continued to assure the Troika that he would honor his commitment to share the sale proceeds with them.").)

Defendant testified at his deposition that he thought it was true that he had told Plaintiffs that he would "do something" for them as a result of the sale to Dragados.  (Schiavone Dep. at 114:13-16.)  However, he stated that he did not recall what that "something" was, and he thought he did not have it formulated at the time he made the statement.  (Schiavone Dep. at 114:17-19.) He further testified that he did not think he had even considered paying Plaintiffs some kind of bonus for consideration for their

8

assistance and cooperation regarding the sale until after the sale was consummated.  (Schiavone Dep. at 123:21-124:2; see also Schiavone Dep. at 132:4-15 ("I think I did . . . promise some, some kind of consideration at some point.").)

Cosenzo testified that in an April 2007 meeting held at Defendant's house, Defendant presented Plaintiffs with the Second Draft "and indicated . . . [that he] was . . . changing the 5 percent which is split three ways to 6 percent, but [he] made some other minor changes," and that Plaintiffs agreed that they would review those changes.  (Cosenzo Dep. at 21:10-22:2.) Cosenzo further testified that after the sale of SCC to Dragados was announced, he had "several conversations with Mr. Schiavone" between May and August 2007 in which Cosenzo said, "You discussed, you know, us sharing in the proceeds of the sale, but yet we haven't heard, you know, from you as far as what we can agree to here."  (Cosenzo Dep. at 29:17-30:5.)  According to Cosenzo, Defendant responded, "No," but continued, "I have every intention of sitting down with each one of yous [sic].  I'd like to do it individually, but I absolutely will do this."  (Cosenzo Dep. at 30:6-9.)  However, Defendant did not say what he was going to do.  (Cosenzo Dep. at 30:10-11.)

Plaintiffs suggest that it was the intention of the parties that payment of the share of the sale proceeds at issue would

come from Defendant personally, not SCC, "because that is what he
consistently represented to them." (Pls. Supp'l Stmt. Facts at ¶
32.)  The December 14, 2007 letter sent from Plaintiffs to both
Defendant and Donovan refers to "compensation to which we believe
we are entitled for our years of service to the Company and the
contribution we have made to its growth and development,
reflected ultimately in the current value of the Company and the
purchase price in the proposed transaction," and that Plaintiffs
understood that "compensation for our past contributions will be
paid by you, the Company's owners, and not by the Company." (12-
14-07 Letter.)  Defendant disputes this, pointing to the First
Draft and Second Draft as proof for the proposition that the
parties understood that any such payment would be provided by
SCC, not Defendant personally. (Dkt. entry no. 41-1, Def. Resp.
to Pls. Supp'l Stmt. Facts at ¶ 32.)

The record indicates that Donovan made payments of $750,000
to each of the Plaintiffs following the sale of SCC to Dragados.
(Taylor Cert., Ex. G, 8-26-08 Letters to Plaintiffs.)  However,
in deposition testimony taken in a separate action, Ronald A.
Schiavone v. Dragados, S.A., No. 09-409 (KSH) (D.N.J.), Donovan
testified that he had never made a promise to Plaintiffs to do
so; rather, he unilaterally decided to pay them "because [he]
felt they deserved it." (Taylor Cert., Ex. J, Donovan Dep. at

10

85:5-86:15; <u>see also</u> <u>id.</u> at 88:9-25 (referring to the August 2007
memo prepared by Plaintiffs and denying the existence of any
agreement by SCC ownership to pay Plaintiffs 2% of the sale value
of SCC).)

C.   **Current Motion**

Defendant previously moved for summary judgment.  The Court
denied that motion without prejudice and granted the Plaintiffs'
cross motion to compel the deposition of Schiavone.  (Dkt. entry
no. 26, 9-3-10 Order.)  Defendant now so moves again, arguing
that (1) no enforceable oral contract existed; (2) the unexecuted
draft agreements show that it was contemplated that SCC, not
Schiavone personally, would pay a percentage of the proceeds of
the sale; (3) the promissory estoppel claim fails for lack of a
definite promise; (4) the quasi-contract claims fail because
Plaintiffs, as "highly compensated executives" of SCC, had "no
reasonable expectation of receiving any additional compensation
in the event" of the sale of the company; (5) the fraudulent and
negligent misrepresentation claims fail for lack of a definite
promise and a lack of reliance; and (6) Plaintiffs' "sham
affidavits" should be disregarded for purposes of deciding the
instant motion to the extent they contradict Plaintiffs' earlier

deposition testimony.  (Dkt. entry no. 37, Def. Br. at 2, 9, 16, 18, 20, 23-25.)[1]

Plaintiffs oppose the motion, contending that factual disputes exist with respect to the existence of an enforceable contract with Defendant, Plaintiffs' reasonable reliance on Defendant's representations and reasonable expectation of receiving a benefit under a quasi-contract theory, and that Defendant made promises knowing he did not intend to keep them. (Pls. Opp'n Br.)  Plaintiffs contend that they are entitled to $1.5 million each from Defendant:  2% each of Defendant's half share of the $150 million in proceeds from the sale of SCC to Dragados.

## II.  Summary Judgment Standard

The standard for a motion for summary judgment is well-settled and will be briefly summarized here.  Rule 56 provides

---

[1] "A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant."  Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007).  A contradictory affidavit need not be disregarded if there is either (1) independent corroborating evidence, or (2) a "satisfactory explanation" for the conflict between a subsequent affidavit and a prior deposition.  Id. at 254.  As the Court indicated at oral argument, we are satisfied that Plaintiffs' affidavits are not sham affidavits, insofar as Plaintiffs, who are not attorneys, could have understood their testimony that no agreement existed to mean no written agreement existed.  (See Hamill Dep. at 35:22-37:1; Pls. Opp'n Br. at 36-37.)

that summary judgment is proper if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a).  In making this determination, the Court must "view[] the record in the light most favorable to the non-moving party and draw[] all inferences in that party's favor."  United States ex rel. Josenske v. Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir. 2009) (citing Abramson v. William Patterson Coll., 260 F.3d 265, 276 (3d Cir. 2001)).

## III. Analysis

### A.   Breach of Contract Claim

To establish a claim for breach of contract, Plaintiffs must show (1) a contract between the parties, (2) a breach of that contract, (3) damages flowing therefrom, and (4) that the plaintiffs performed their own contractual obligations. Frederico v. Home Depot, 507 F.3d 188, 203 (3d Cir. 2007).  It is the first element that is dispositive here.

"A contract arises from offer and acceptance, and must be sufficiently definite that the performance to be rendered by each party can be ascertained with reasonable certainty.  Thus, if the parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract." Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992) (internal

quotation and citations omitted).  The contract terms must be sufficiently definite so "that the performance to be rendered by each party can be ascertained with reasonable certainty," and "[i]f the parties do not agree on one or more essential terms of the purported agreement," an enforceable contract will generally not be formed.  Baer v. Chase, 392 F.3d 609, 619 (3d Cir. 2004) (citing Weichert Co. Realtors, 128 N.J. at 435).

Contrary to Defendant's assertion that evidence of the oral contract need be proven by clear and convincing evidence, we consider only whether Plaintiff's proofs demonstrate the existence of an oral contract by a preponderance of the evidence, and find that they do not.  Compare Dent v. Cingular Wireless, LLC, No. 07-552, 2007 WL 1797653, at *6 (D.N.J. June 20, 2007) (applying preponderance of the evidence standard to claim for breach of non-lifetime employment contract) with Shebar v. Sanyo Bus. Sys. Corp., 111 N.J. 276, 287 (1988) (applying clear and convincing evidence standard to the "extraordinary" instance of a contract for lifetime employment).  (Cf. Def. Br. at 12.)

### 1.   The Alleged Oral Agreement

Plaintiffs' insistence that the parties "had an agreement that the Troika would share in a percentage of the sale proceeds" as of August 2007 is vague and indefinite as to both the percentage amount, and the time in which payment would occur.

(Pls. Opp'n Br. at 7.)   The only "agreement" present in the record is that Defendant promised to "do something."   Although the Court accepts that the parties understood this in context to mean "share in a percentage of the proceeds" of the sale of SCC, the fact remains that the promise was so indefinite that no enforceable contract was created.   See Heim v. Shore, 151 A.2d 556, 560-62 (N.J. App. Div. 1959) (finding no enforceable contract where "all that was certain was that 50 lots were to be conveyed to plaintiffs" on a date certain "under a liberal mortgage plan" because essential terms of the mortgage, "including the amount, amortization payments, and interest rate, were not clearly established," nor were the due date or default provisions, and it was not inferable that the parties ever reached a final agreement as to these terms).

The conduct of the parties confirms that no agreement as to amount or time was ever reached, as Plaintiffs wrote letters in 2007 and 2008 effectively attempting to negotiate with Defendant what the percentage would be, and Defendant responded by expressing his intention to sit down with Plaintiffs individually and finalize what "something" he would "do," but this never occurred.   (See 12-14-07 Letter ("We request that you provide us with the amount of compensation we can expect"); Cosenzo Dep. at 29:17-30:11; Pls. Opp'n Br. at 7.)   Plaintiffs' objective

15

manifestations show that no agreement had been reached, and certainly not with definite terms.

We decline to adopt the 2% figure from the never-executed Second Draft as the price term to the alleged oral contract, as Plaintiffs urge.  First, it is undisputed that Plaintiffs did not accept the terms of the Second Draft, though they claim to have accepted the 2% aspect of that offer.  (Pls. Opp'n Br. at 8; Hamill Dep. at 44:2-25; Cosenzo Dep. at 24:18-25:14.)  There is simply no basis in law to allow Plaintiffs unilaterally to accept part of a proposed written contract while rejecting the contract generally.  See Heim, 151 A.2d at 561 ("Parties are not bound by what they think, but rather by what they say."); see also State v. Ernst & Young, LLP, 902 A.2d 338, 345 (N.J. App. Div. 2006) ("In the very nature of the contract, acceptance must be absolute," and an expression of assent that modifies the substance of the offer does not create an enforceable contract but rather constitutes a counter-offer);  cf. Weichert Co. Realtors, 128 N.J. at 436-37 (stating that offeree may create a contract implied-in-fact "where an offeree gives no indication that he or she objects to any of the offer's essential terms, and passively accepts the benefits of an offeror's performance") (emphasis added).

Even if Plaintiffs had not rejected the offer containing the 2% term, as discussed above, Plaintiffs' 2007 and 2008 communications requesting discussion with Defendant as to the amount of compensation they could expect to receive contravenes their assertion that they believed that the parties had already agreed to the 2% figure.  The 2% term, as indicated in the drafts, was to be paid by SCC, not Defendant personally.  There is simply no evidence in the record that <u>Defendant</u> ever promised to pay Plaintiffs 2% (or any other specific amount) of the proceeds of SCC's sale.  (<u>See, e.g.</u>, Taylor Cert., Ex. B, Scagnelli Dep. at 49:16-50:8 (stating that the only basis for his belief that Defendant had promised to pay 2% each was Defendant's manually changing 1.66% to 2% in the Second Draft during the April 2007 meeting); Scagnelli Aff. at ¶ 12.)  The Court will not conflate Defendant's vague, precatory promise to "do something" for Plaintiffs with the offer (that Plaintiffs rejected) by Defendant on behalf of SCC to have SCC pay Plaintiffs 2% of the proceeds of a sale in exchange for Plaintiffs becoming bound by the terms of the proposed Employment Agreements.  Rather, the record shows an ongoing negotiation in which Defendant successfully staved off Plaintiffs' efforts to reach an agreement by never agreeing to sufficiently definite terms to form a contract.  (<u>See, e.g.</u>, Hamill Dep. at 41:6-10 (stating that

during impromptu meetings to discuss the employment agreement and compensation issues, Defendant "kept saying he had to– he would get back to us, he had to think about it.  He never gave us a direct answer about the agreement while we talked.  He kept saying that he had to think about it, and he would be back to us."); Cosenzo Dep. at 30:6-11, 36:4-37:10, 40:17-41:9 (stating that after the Second Draft offer, Defendant "didn't indicate that he would follow through with the 2 percent that was indicated" in the Second Draft, "but he indicated that he would do something.").)

### 2.    Implied in Fact Employment Agreements

Plaintiffs assert that under New Jersey law, employment contracts may be implied through circumstances of employment, and urge the Court to find that as a matter of law, the promise that Plaintiffs would share in the proceeds of SCC's sale was part of their oral employment agreement since 2006, "the parties' attempts to reduce the agreement to writing was meant . . . as a memorialization of an agreement that was already in place," and a factfinder could conclude that "Defendant's silence in the face of" Plaintiffs' continued employment and support of the sale "was an acquiescence to" the contemplated 2% share of the sale proceeds.  (Pls. Opp'n Br. at 10-13 (citing, inter alia, Troy v. Rutgers, 168 N.J. 354, 365 (2001)).)

18

The Court takes no issue with the proposition that unilateral employment contracts may be created where the employer makes a promise regarding compensation that is accepted by the employee's silence and continued performance of employment.  See, e.g., Levy v. Lucent Techs., Inc., No. 01-2936, 2003 WL 118500, at *8-13 (S.D.N.Y. Jan. 14, 2003) (applying New Jersey law). However, the record evidence simply does not support the inferences Plaintiffs urge the Court to draw.  The unilateral contract analysis, in cases of individual contracts with particular employees, "should be analyzed by those contractual principles that apply when the claim is one that an oral employment contract exists," and thus the above analysis regarding the alleged oral contract applies.  See Shebar, 111 N.J. at 288.[2]  Additionally, such case law is inapposite, insofar as Plaintiffs insist that a contract existed with, and seek to recover damages from, Defendant--not SCC.

---

[2]  Plaintiffs emphasize that contractual employment terms may be accepted by employees' silence.  (Pls. Opp'n Br. at 12.) However, the record does not indicate that Plaintiffs were "silent" on the issue of a potential payment of a share in the proceeds of the sale of the company.  Rather, they actively negotiated and sought clarification on the issue, openly rejecting one offer, and their subsequent communications with Defendant indicated that no agreement as to the material term of amount had ever been reached.

Viewing the evidence in the light most favorable to Plaintiffs, it is undisputed that Defendant never did anything more than to promise to "do something" for Plaintiffs.  This promise is vague as to the material terms of the amount of what the parties understood to refer to a payment of some kind, as well as the time frame in which such payment would be made.  Such a vague promise cannot form the basis of an enforceable contract.  The Court will therefore enter judgment in favor of Defendant on the breach of contract claim.

**B.    Breach of Covenant of Good Faith and Fair Dealing**

Implied covenants of good faith and fair dealing are implied in every contract in New Jersey.  Wilson v. Amerada Hess Corp., 168 N.J. 236, 244 (2001).  Insofar as no contract existed, Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing fails as well, and the Court will enter judgment in favor of Defendant on that claim.  See Shakib v. Back Bay Rest. Grp., Inc., No. 10-4564, 2011 WL 4594654, at *6 (D.N.J. Sept. 30, 2011).

**C.    Promissory Estoppel**

Plaintiffs must show, to prevail on their promissory estoppel claim, (1) a clear and definite promise, (2) made with the expectation that the promisee rely on it, (3) reasonable reliance by the promisee, and (4) a definite and substantial

detriment as a result, such that the promise should be enforced to avoid injustice.  Ross v. Celtron Int'l, 494 F.Supp.2d 288. 296 (D.N.J. 2007).  Under New Jersey law, "the sine qua non of a promissory estoppel claim is a clear and definite promise."  Id. The Court, for the reasons stated above, finds this element lacking.

Defendant's promises to "do something" or that he would be inclined to provide Plaintiffs "some kind of consideration at some point" are simply too unclear and indefinite to support a claim for promissory estoppel.  See Del Sontro v. Cendant Corp., Inc., 223 F.Supp.2d 563, 574-75 (D.N.J. 2002).  (See, e.g., Cosenzo Dep. at 30:6-11 ("Q.  Did [Defendant] say what he was going to do?  A.  No.").)  The conduct of the parties demonstrates that this promise remained unresolved and subject to change until months after the sale of SCC, and thus is too vague to be enforced.  (Cosenzo Dep. at 32:16-24; 12-14-07 Letter; 7-28-08 Letter.)

Plaintiffs' alleged "reliance" is their decision to stay on and provide continuity of management after the sale in order to maximize the value of the sale of SCC, but their own description of their understanding and their reliance on the "informal promises" of Defendant and Donovan demonstrates a total lack of specificity as to what was being promised.  (See Scagnelli Dep.

21

at 37:12-38:4 (stating that he understood that if he were to stay on as an executive after the sale of SCC to Dragados, Plaintiffs would be "treated properly" by Defendant and Donovan in the sense that "they would follow through on their informal promises that [Plaintiffs] would not be sorry if [they] hung in there and helped with the sale of the company. . . .").)  The Court will therefore enter judgment in favor of Defendant on the promissory estoppel claim.

### D.  Unjust Enrichment/Quantum Meruit

A claim will lie in quasi-contract where a person (1) has conferred a benefit on another, and (2) should be compensated for the benefit conferred because the conferring party reasonably expected payment.  Weichert Co. Realtors, 128 N.J. at 437. Although Plaintiffs have pleaded "unjust enrichment" and "quantum meruit" as separate claims, they are merely two different names for the same quasi-contract concept, and thus will be treated as a single claim.  (See Pl. Opp'n Br. at 25.)

Defendant contends that Plaintiffs had no reasonable expectation of receiving any compensation associated with the sale of SCC, insofar as they were not shareholders of SCC, and were highly compensated executives who received a salary, annual bonuses, health insurance, retirement benefits, and other perks under their oral employment agreements with SCC.  (Def. Br. at

18.)  Plaintiffs submit that, based on their thirty-year history of handshake agreements and mutual respect with Defendant, they reasonably relied on the promise that they would share in the proceeds of the sale, and they conferred a benefit on Defendant "by staying on as SCC's management and facilitating the sale to Dragados."  (Pl. Opp'n Br. at 26-27.)

The record does not support an inference that Plaintiffs believed Defendant's promise to "do something" (share in the proceeds of the sale of the company) to be in exchange directly for their staying on as executives, but rather, as they wrote in the 12-14-07 Letter, "compensation to which we believe we are entitled for our years of service to the Company and the contribution that we have made to its growth and development, reflected ultimately in the current value of the Company and the purchase price in the proposed transaction."  (12-14-07 Letter.)  This is past consideration that cannot form the basis of a contractual or quasi-contractual obligation.  Broad St. Nat'l Bank of Trenton v. Collier, 169 A. 552, 554 (N.J. 1933).  The 12-14-07 Letter referenced Plaintiffs' expectation of "compensation for our past contributions."  (12-14-07 Letter.)  Plaintiffs have not shown that they conferred a benefit on Defendant beyond that for which they were compensated in the form of salary, bonuses, and other benefits of employment.  The Court agrees with

Defendant that there is nothing "unjust" about Defendant's
receipt of 50% of the proceeds of the sale of SCC, given that he
was a 50% shareholder, nor was it unjust for Plaintiffs'
compensation to be limited to that to which they were entitled in
exchange for their duties as executives of SCC, and their
exercise of their fiduciary duties as officers of SCC cannot be
said to have unjustly enriched Defendant.  See VRG Corp. v. GKN
Realty Corp., 135 N.J. 539, 554-55 (1994).  The Court will
therefore enter judgment in favor of Defendant on the quasi-
contract claims.

   **E.   Fraud and Misrepresentation**

   Plaintiffs assert claims that Defendant knew or should have
known that he was falsely promising to share a percentage of the
sale proceeds with Plaintiffs.  (Pls. Opp'n Br. at 28.)  A claim
for fraud or fraudulent misrepresentation requires a showing of
the following elements: (1) a material misrepresentation of fact,
(2) knowledge or belief by the defendant of its falsity, (3)
intention that the other person rely on it, (4) reasonable
reliance thereon by the other person, and (5) resulting damage.
Frederico, 507 F.3d at 200.  The elements of a claim for
negligent misrepresentation are (1) an incorrect statement, (2)
negligently made, (3) justifiably relied on, (4) resulting in

24

economic loss.  <u>Barows v. Chase Manhattan Mortg. Corp.</u>, 465
F.Supp.2d 347, 367 (D.N.J. 2006).

Defendant contends that the negligent misrepresentation
claim fails as a matter of law insofar as it is based upon
Defendant's representation that he would "do something" for
Plaintiffs, because "it is impossible to negligently misrepresent
one's own state of mind or intentions."  (Def. Br. at 21.)
Defendant further argues that "Plaintiffs have presented no
evidence that those statements were untrue as of the time they
were made other than the fact that Mr. Schiavone did not
ultimately 'do something' for them."  (<u>Id.</u> at 21-22.)

The Court finds that no claim for negligent
misrepresentation may lie here, insofar as the statement "do
something" was an expression of Defendant's own state of mind as
to a future intention.  <u>See, e.g.</u>, <u>Malone v. Cemetery St. Dev.,
Inc.</u>, No. 94-339, 1995 WL 85288, at *2 (D.N.H. Feb. 17, 1995).
We further find that the record here does not present a fraud
case and that there is a failure of proof to support such
claims.[3]  "Do something" was a vague statement of future intent,

---

[3]  The cases cited by Plaintiffs in support of their
misrepresentation claims are securities and products liability
cases that do not support an application of the fraudulent
misrepresentation paradigm in the context presented here.  (<u>See</u>
Pls. Opp'n Br. at 28-29.)

and while Defendant failed to follow through with what Plaintiffs unilaterally thought that may have meant, there is no evidence in the record suggesting that the statement was false at the time it was made.  (Cf. Pls. Opp'n Br. at 29-30 (arguing that because the "promise to 'do something' turned out to be false," a finder of fact "could find that Defendant knew or should have known that he would never share with the Troika a share of his proceeds.").)  This is a tautology that the Court will not convert to a claim for fraud.  See Spano v. JP Morgan Chase Bank, N.A., No. 09-4055, 2011 WL 6934837, at *5 (D.N.J. Dec. 30, 2011); Darrick Enters. v. Mitsubishi Motors Corp., No. 05-4359, 2007 WL 2893366, at *2-4 (D.N.J. Sept. 28, 2007); Ocean Cape Hotel Corp. v. Masefield Corp., 164 A.2d 607, 612-14 (N.J. App. Div. 1960) (stating that fraudulent representation claims "must relate to some past or presently existing fact and cannot ordinarily be predicated upon matters in futuro. . . . The intention of the promisor not to perform is not sufficiently established by mere proof of nonperformance.").

The Court will therefore enter judgment in favor of Defendant on the common law fraud/misrepresentation and negligent misrepresentation claims.

26

**IV.   Conclusion**

For the reasons stated, the Court will grant summary judgment in favor of Defendant.  The Court will issue an appropriate Order and Judgment.


                              __s/ Mary L. Cooper_____
                              **MARY L. COOPER**
                              United States District Judge

Dated:   August 20, 2012

27